# MINNESOTA v. BARBER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MINNESOTA.

No. 1346.  Argued January 14, 15, 1890.—Decided May 19, 1890.

The statute of Minnesota approved April 16, 1889, entitled " an act for the
protection of the public health by providing for inspection, before
slaughtering, of cattle, sheep and swine designed for slaughter for hu-
man food," is unconstitutional and void so far as it requires, as a con-
dition of sales in Minnesota of fresh beef, veal, mutton, lamb or pork,
for human food, that the animals, from which such meats are taken,
shall have been inspected in that State before being slaughtered.

In whatever language a statute may be framed, its purpose must be deter-
mined by its natural and reasonable effect; and the presumption that it
was enacted in good faith, for the purpose expressed in the title, cannot
control the determination of the question whether it is, or is not, repug-
nant to the Constitution of the United States.

This statute of Minnesota, by its necessary operation, practically excludes
from the Minnesota market all fresh beef, veal, mutton, lamb or pork,
in whatever form, and although entirely sound, healthy and fit for hu-
man food, taken from animals slaughtered in other States; and as it
thus directly tends to restrict the slaughtering of animals, whose meat
is to be sold in Minnesota for human food, to those engaged in such
business in that State, it makes such discrimination against the products
and business of other States in favor of the products and business of
Minnesota, as interferes with and burdens commerce among the several
States.

A law providing for the inspection of animals, whose meats are designed
for human food, cannot be regarded as a rightful exertion of the police
power of the State, if the inspection prescribed is of such a character,
or is burdened with such conditions, as will prevent the introduction into
the State of sound meats, the product of animals slaughtered in other
States.

A burden imposed upon interstate commerce is not to be sustained simply
because the statute imposing it applies alike to the people of all the
States, including the people of the State enacting it.

THIS was a petition for a writ of *habeas corpus*. The peti-
tioner had been convicted of a violation of the statute of Min-
nesota respecting the inspection of fresh meats which will be
found at length in the opinion of the court (*post* 318). The

State of Indiana having passed a similar statute, counsel inter-
vened on behalf of that State and took part in the argument
of this case. The Indiana statute will be found in the mar-
gin [1]. The petitioner was discharged from custody, the court
below holding the act to be an unconstitutional interference
with commerce among the States. The State took this ap-
peal.

*Mr. Gordon E. Cole* for appellant. The closing passages in
*Mr. Cole's* brief were as follows:

I sum up the argument thus:

1st. If inspection in life is necessary to detect disease, it
may be required by state legislation, although it may inci-
dentally affect commerce.

2d. If the legislature deem such inspection necessary, and
manifest such an opinion by an enactment requiring it, the
presumptions which surround a legislative enactment must

---

[1] INDIANA STATUTE, ACTS 1889, c. 84.

An act for the protection of the public health by promoting the growth
and sale of healthy cattle and sheep, making it a misdemeanor to sell the
same without inspection before the slaughtering within this State, and to
authorize cities to appoint inspectors. *Approved March 2, 1889.*

SECTION 1. *Be it enacted by the General Assembly of the State of Indiana,*
That it shall be unlawful to sell, or offer, or expose for sale in any incorpo-
rated city within this State, beef, mutton, veal, lamb or pork for human
food, except as hereinafter provided, which has not been inspected alive
within the county by an inspector or his deputy duly appointed by the
authorities of said county in which such beef, mutton, veal, lamb or pork is
intended for consumption, and found by such inspector to be pure, healthy
and merchantable, and for every such offence the accused, after conviction,
shall be fined not more than two hundred dollars nor less than ten dollars.

SEC. 2. That the City Council is hereby empowered and required to
appoint, in each incorporated city within the county, one or more inspect-
ors and deputies, furnish the necessary blanks and decree the fees for such
inspection: *Provided,* That where farmers slaughter cattle, sheep or swine
of their own raising or feeding for human food, no other inspection shall
be required, or penalty imposed, than such as are already provided by law
to prevent the sale and consumption of diseased meat.

SEC. 3. Nothing herein contained shall prevent or obstruct the sale of
cured beef or pork known as dried, corned or canned beef, or smoked or
salted pork, or other cured or salted meats.

sustain it, unless it manifestly on its face has no relation to its professed object.

3d. No evidence can be received in support of or opposition to the law, as was held in *Powell* v. *Pennsylvania;* but if such evidence was competent, the burden of proof is not on those seeking to sustain the law, to show the necessity of inspection in life to detect disease, but upon those who would overthrow it, to show the inadequacy of such inspection, or that the inspection of dressed meats would serve the same purpose.

The party who stands upon presumptions is not required in the first instance to support them by evidence.

A powerful combine has thrown its gauntlet at the sovereignty of the States and is engaged in a grand duello with both State and nation. Shall the right of self preservation, never yet denied to the States by the most rabid advocate of federal supremacy, yield to the selfish greed of a gigantic, moneyed interest, and their power to adopt such measures as are necessary to detect danger be swept away, because commerce in an article in a particular form may be affected thereby, is the question I herewith submit for decision.

*Mr. James O. Broadhead* filed a brief on behalf of the appellant.

*Mr. W. C. Goudy* and *Mr. Walter H. Sanborn* for appellee.

*Mr. George W. McCrary* and *Mr. Wallace Pratt* filed a brief on behalf of the appellee.

*Mr. Alpheus H. Snow* on behalf of the State of Indiana. *Mr. Louis T. Michener*, Attorney General of the State of Indiana, *Mr. Joseph E. McDonald* and *Mr. John M. Butler* were with him on the brief, which concluded as follows :

We conclude, therefore, that the statute in question is not an unlawful regulation of interstate commerce but an exercise of the police power proper, affecting interstate commerce, in

a lawful manner and to only a lawful extent, because dressed meat, the commodity which is the subject matter of the legislation, being an article of human food, and hence "usually passing by sale from hand to hand," and being capable of a quality, state or condition rendering it dangerous to life, health and property, viz.: to decay, disease and infection in ordinary commercial use without the voluntary coöperation of the citizen whose life, liberty or property is injuriously affected and without blame on his part and hence a proper subject of police regulation by way of inspection; and being incapable of a legal inspection except under the conditions imposed by the statute, is properly subjected to permanent prohibition upon failure to conform to the conditions of inspection; such right of prohibition being a necessary incident of the right of inspection, and being justifiable on the ground that dressed meat, when uninspected as required by the statute, is in a permanently and incurably dangerous condition to life, health and property in its ordinary commercial use, because its true state, condition or quality can never be determined by any rapid, cheap and "crucial test"—that is, by inspection, (by reason of the fact that dressed meat differs from meat in an inspectable condition—that is, in the living animal—only in the subtraction of those *indicia* which render the dangerous state, condition or quality determinable by inspection,) but only by a judicial examination requiring expense and delay, which judicial examination the State is not required or permitted to provide for, as respects property in its ordinary commercial use, because the expense and delay of such judicial examination to the applicant would equally operate as a prohibition to him upon such use of his property, and because of the expense of the necessary court machinery for making such a great number of judicial examinations as would be necessary would impose so great a burden of taxation upon the community as to violate the constitutional rights of all citizens to their property.

We submit, therefore, that the law under which the appellee was convicted is constitutional, and that the judgment of the Circuit Court of the United States, discharging the

appellee from custody, was erroneous and ought to be reversed.

MR. JUSTICE HARLAN delivered the opinion of the court.

Henry E. Barber, the appellee, was convicted before a justice of the peace in Ramsey County, Minnesota, of the offence of having wrongfully and unlawfully offered and exposed for sale, and of having sold, for human food, one hundred pounds of fresh uncured beef, part of an animal slaughtered in the State of Illinois, but which had not been inspected in Minnesota, and "certified" before slaughter by an inspector appointed under the laws of the latter State. Having been committed to the common jail of the county pursuant to a judgment of imprisonment for the term of thirty days, he sued out a writ of *habeas corpus* from the Circuit Court of the United States for the District of Minnesota, and prayed to be discharged from such imprisonment, upon the ground that the statute of that State, approved April 16, 1889, and under which he was prosecuted, was repugnant to the provision of the Constitution giving Congress power to regulate commerce among the several States, as well as to the provision declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States. Art. 1, Sec. 8. Art. 4, Sec. 2. The court below, speaking by Judge Nelson, held the statute to be in violation of both of these provisions, and discharged the prisoner from custody. *In re Barber*, 39 Fed. Rep. 641. A similar conclusion in reference to the same statute had been previously reached by Judge Blodgett, holding the Circuit Court of the United States for the Northern District of Illinois. *Swift v. Sutphin*, 39 Fed. Rep. 630.

From the judgment discharging Barber the State has prosecuted the present appeal. Rev. Stat. § 764; 23 Stat. 437, c. 353.

Attorneys representing persons interested in maintaining the validity of a statute of Indiana, alleged to be similar to that of Minnesota, were allowed to participate in the argument in this court, and to file briefs.

The statute of Minnesota upon the validity of which the decision of the case depends is as follows: Laws of 1889, c. 8, p. 51.

"*An act for the protection of the public health by providing for inspection, before slaughter, of cattle, sheep and swine designed for slaughter for human food.*

"SECTION 1. The sale of any fresh beef, veal, mutton, lamb or pork for human food in this State, except as hereinafter provided, is hereby prohibited.

"SEC. 2. It shall be the duty of the several local boards of health of the several cities, villages, boroughs and townships within this State to appoint one or more inspectors of cattle, sheep and swine, for said city, village, borough or township, who shall hold their offices for one year, and until their successors are appointed and qualified, and whose authority and jurisdiction shall be territorially coëxtensive with the board so appointing them; and said several boards shall regulate the form of certificate to be issued by such inspectors and the fees to be paid them by the person applying for such inspection, which fees shall be no greater than are actually necessary to defray the costs of the inspection provided for in section three of this act.

"SEC. 3. It shall be the duty of the inspectors appointed hereunder to inspect all cattle, sheep and swine slaughtered for human food within their respective jurisdictions within twenty-four hours before the slaughter of the same, and if found healthy and in suitable condition to be slaughtered for human food, to give to the applicant a certificate in writing to that effect. If found unfit for food by reason of infectious disease, such inspectors shall order the immediate removal and destruction of such diseased animals, and no liability for damages shall accrue by reason of such action.

"SEC. 4. Any person who shall sell, expose or offer for sale for human food in this State, any fresh beef, veal, mutton, lamb or pork whatsoever, which has not been taken from an animal inspected and certified before slaughter, by the proper local inspector appointed hereunder, shall be deemed guilty of

a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than one hundred dollars, or by imprisonment not exceeding three months for each offence.

"SEC. 5. Each and every certificate made by inspectors under the provisions of this act shall contain a statement to the effect that the animal or animals inspected, describing them as to kind and sex, were, at the date of such inspection, free from all indication of disease, apparently in good health, and in fit condition, when inspected, to be slaughtered for human food; a duplicate of which certificate shall be preserved in the office of the inspector.

"SEC. 6. Any inspector making a false certificate shall be liable to a fine of not less than ten dollars nor more than fifty dollars for each animal falsely certified to be fit for human food under the provisions of this act.

"SEC. 7. This act shall take effect and be in force from and after its passage."

, The presumption that this statute was enacted, in good faith, for the purpose expressed in the title, namely, to protect the health of the people of Minnesota, cannot control the final determination of the question whether it is not repugnant to the Constitution of the United States. There may be no purpose upon the part of a legislature to violate the provisions of that instrument, and yet a statute enacted by it, under the forms of law, may, by its necessary operation, be destructive of rights granted or secured by the Constitution. In such cases, the courts must sustain the supreme law of the land by declaring the statute unconstitutional and void. This principle of constitutional interpretation has been often announced by this court. In *Henderson &c.* v. *New York &c.*, 92 U. S. 259, 268, where a statute of New York imposing burdensome and almost impossible conditions on the landing of passengers from vessels employed in foreign commerce, was held to be unconstitutional and void as a regulation of such commerce, the court said that "in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect." In *People* v. *Compagnie Générale Transatlantique*, 107 U. S. 59, 63, where the question was as to the

validity of a statute of the same State, which was attempted to be supported as an inspection law authorized by section 10 of article 1 of the Constitution, and was so designated in its title, it was said: "A State cannot make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease and to cure the sick, an inspection law, within the constitutional meaning of that word, by calling it so in the title." So, in *Soon Hing* v. *Crowley*, 113 U. S. 703, 710: "The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments." In *Mugler* v. *Kansas*, 123 U. S. 623, 661, the court, after observing that every possible presumption is to be indulged in favor of the validity of a statute, said that the judiciary must obey the Constitution rather than the law making department of the government, and must, upon its own responsibility, determine whether, in any particular case, the limits of the Constitution have been passed. It was added: "If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." Upon the authority of those cases, and others that could be cited, it is our duty to inquire, in respect to the statute before us, not only whether there is a real or substantial relation between its avowed objects and the means devised for attaining those objects, but whether by its necessary or natural operation it impairs or destroys rights secured by the Constitution of the United States.

Underlying the entire argument in behalf of the State is the proposition, that it is impossible to tell, by an inspection of

fresh beef, veal, mutton, lamb or pork, designed for human food, whether or not it came from animals that were diseased when slaughtered; that inspection on the hoof, within a very short time before animals are slaughtered, is the only mode by which their condition can be ascertained with certainty. And it is insisted, with great confidence, that of this fact the court must take judicial notice. If a fact, alleged to exist, and upon which the rights of parties depend, is within common experience and knowledge, it is one of which the courts will take judicial notice. *Brown* v. *Piper*, 91 U. S. 37, 42; *Phillips* v. *Detroit*, 111 U. S. 604, 606. But we cannot assent to the suggestion that the fact alleged in this case to exist is of that class. It may be the opinion of some that the presence of disease in animals, at the time of their being slaughtered, cannot be determined by inspection of the meat taken from them; but we are not aware that such is the view universally, or even generally, entertained. But if, as alleged, the inspection of fresh beef, veal, mutton, lamb or pork will not necessarily show whether the animal from which it was taken was diseased when slaughtered, it would not follow that a statute like the one before us is within the constitutional power of the State to enact. On the contrary, the enactment of a similar statute by each one of the States composing the Union would result in the destruction of commerce among the several States, so far as such commerce is involved in the transportation from one part of the country to another of animal meats designed for human food, and entirely free from disease. A careful examination of the Minnesota act will place this construction of it beyond question.

The first section prohibits the sale of any fresh beef, veal, mutton, lamb or pork for human food, except as provided in that act. The second and third sections provide that all cattle, sheep and swine to be slaughtered for human food within the respective jurisdictions of the inspectors, shall be inspected by the proper local inspector appointed in Minnesota, within twenty-four hours before the animals are slaughtered; and that a certificate shall be made by such inspector, showing (if such be the fact) that the animals, when slaughtered, were

found healthy and in suitable condition to be slaughtered for human food. The fourth section makes it a misdemeanor, punishable by fine or imprisonment, for any one to sell, expose or offer for sale, for human food, in the State, any fresh beef, veal, mutton, lamb or pork, not taken from an animal inspected and "certified before slaughter, by the proper local inspector" appointed under that act. As the inspection must take place within the twenty-four hours immediately before the slaughtering, the act, by its necessary operation, excludes from the Minnesota market, practically, all fresh beef, veal, mutton, lamb or pork — in whatever form, and although entirely sound, healthy, and fit for human food — taken from animals slaughtered in other States; and directly tends to restrict the slaughtering of animals, whose meat is to be sold in Minnesota for human food, to those engaged in such business in that State. This must be so, because the time, expense and labor of sending animals from points outside of Minnesota to points in that State to be there inspected, and bringing them back, after inspection, to be slaughtered at the place from which they were sent — the slaughtering to take place within twenty-four hours after inspection, else the certificate of inspection becomes of no value — will be so great as to amount to an absolute prohibition upon sales, in Minnesota, of meat from animals not slaughtered within its limits. When to this is added the fact that the statute, by its necessary operation, prohibits the sale, in the State, of fresh beef, veal, mutton, lamb or pork, from animals that may have been inspected carefully and thoroughly in the State where they were slaughtered, and before they were slaughtered, no doubt can remain as to its effect upon commerce among the several States. It will not do to say — certainly no judicial tribunal can, with propriety, assume — that the people of Minnesota may not, with due regard to their health, rely upon inspections in other States of animals there slaughtered for purposes of human food. If the object of the statute had been to deny altogether to the citizens of other States the privilege of selling, within the limits of Minnesota, for human food, any fresh beef, veal, mutton, lamb or pork, from animals slaugh-

tered outside of that State, and to compel the people of Minnesota, wishing to buy such meats, either to purchase those taken from animals inspected and slaughtered in the State, or to incur the cost of purchasing them, when desired for their own domestic use, at points beyond the State, that object is attained by the act in question. Our duty to maintain the Constitution will not permit us to shut our eyes to these obvious and necessary results of the Minnesota statute. If this legislation does not make such discrimination against the products and business of other States in favor of the products and business of Minnesota as interferes with and burdens commerce among the several States, it would be difficult to enact legislation that would have that result.

The principles we have announced are fully supported by the decisions of this court. In *Woodruff* v. *Parham*, 8 Wall. 123, 140, which involved the validity of an ordinance of the city of Mobile, Alabama, relating to sales at auction, Mr. Justice Miller, speaking for this court, said: "There is no attempt to discriminate injuriously against the products of other States, or the rights of their citizens, and the case is not therefore an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution which relate to those subjects, and therefore void." So, in *Hinson* v. *Lott*, 8 Wall. 148, 151, decided at the same time, upon a writ of error from the Supreme Court of Alabama, it was said, in reference to the opinion of that court: "And it is also true, as conceded in that opinion, that Congress has the same right to regulate commerce among the States that it has to regulate commerce with foreign nations, and that whenever it exercises that power, all conflicting state laws must give way, and that if Congress had made any regulation covering the matter in question we need inquire no further. That court seems to have relieved itself of the objection by holding that the tax imposed by the State of Alabama was an exercise of the concurrent right of regulating commerce remaining with the

States until some regulation on the subject had been made by Congress. But, assuming the tax to be, as we have supposed, a discriminating tax, levied exclusively upon the products of sister States; and looking to the consequences which the exercise of this power may produce if it be once conceded, amounting, as we have seen, to a total abolition of all commercial intercourse between the States, under the cloak of the taxing power, we are not prepared to admit that a State can exercise such a power, though Congress may have failed to act on the subject in any manner whatever."

In *Welton* v. *Missouri*, 91 U. S. 275, 281, the court, speaking by Mr. Justice Field, declared to be unconstitutional a statute of Missouri, imposing a license tax upon the sale by peddlers of certain kinds of personal property "not the growth, produce or manufacture" of that State, but which did not impose a like tax upon similar articles grown, produced, or manufactured in Missouri. After observing that if the tax there in question could be imposed at all, the power of the State could not be controlled, however unreasonable and oppressive its action, the court said: "Imposts operating as an absolute exclusion of the goods would be possible, and all the evils of discriminating state legislation, favorable to the interests of one State, and injurious to the interests of other States and countries, which existed previous to the adoption of the Constitution, might follow, and the experience of the last fifteen years shows would follow, from the action of some of the States."

In *Railroad Co.* v. *Husen*, 95 U. S. 465, the court examined a statute of Missouri prohibiting, under penalties, any Texas, Mexican, or Indian cattle from being driven or otherwise conveyed into, or remaining in, any county of the State, between the first day of March and the first day of November in each year, by any person or persons whatsoever. While admitting, in the broadest terms, the power of a State to pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders, to prevent convicts, or persons and animals suffering under contagious or infectious diseases, from entering the State, and, for pur-

poses of protection, to establish quarantine and inspections, the court, Mr. Justice Strong delivering its opinion, said that a State may not, "under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce." The general ground upon which it held the Missouri statute to be unconstitutional was, that its effect was "to obstruct interstate commerce, and to discriminate between the property of citizens of one State and that of citizens of other States."

In *Guy* v. *Baltimore,* 100 U. S. 434, 443, the court adjudged to be void an ordinance of the city of Baltimore, exacting from vessels using the public wharves of that city, and laden with the products of other States, higher rates of wharfage than from vessels using the same wharves and laden with the products of Maryland. "Such exactions," the court said, "in the name of wharfage, must be regarded as taxation upon interstate commerce. Municipal corporations, owning wharves upon the public navigable waters of the United States, and *quasi* public corporations transporting the products of the country, cannot be permitted by discriminations of that character to impede commercial intercourse and traffic among the several States and with foreign nations."

The latest case in this court upon the subject of interstate commerce, as affected by local enactments discriminating against the products and citizens of other States, is *Walling* v. *Michigan,* 116 U. S. 446, 455. We there held to be unconstitutional a statute of Michigan, imposing a license tax upon persons, not residing or having their principal place of business in that State, but whose business was that of selling or soliciting the sale of intoxicating liquors to be shipped into the State from places without, a similar tax not being imposed in respect to the sale and soliciting for sale of liquors manufactured in Michigan. Mr. Justice Bradley, delivering the opinion of the court, said: "A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first-mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States."

It is, however, contended, in behalf of the State, that there is, in fact, no interference, by this statute, with the bringing of cattle, sheep and swine into Minnesota from other States, nor any discrimination against the products or business of other States, for the reason — such is the argument — that the statute requiring an inspection of animals on the hoof, as a condition of the privilege of selling, or offering for sale, in the State, the meats taken from them, is applicable alike to all owners of such animals, whether citizens of Minnesota or citizens of other States. To this we answer, that a statute may, upon its face, apply equally to the people of all the States, and yet be a regulation of interstate commerce which a State may not establish. A burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute. *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497; *Case of the State Freight Tax*, 15 Wall. 232. The people of Minnesota have as much right to protection against the enactments of that State, interfering with the freedom of commerce among the States, as have the people of other States. Although this statute is not avowedly, or in terms, directed against the bringing into Minnesota of the products of other States, its necessary effect is to burden or obstruct commerce with other States, as involved in the transportation into that State, for purposes of sale there, of all fresh beef, veal, mutton, lamb or pork, however free from disease may have been the animals from which it was taken.

The learned counsel for the State relies with confidence upon *Patterson* v. *Kentucky*, 97 U. S. 501, as supporting the principles for which he contends. In that case, we sustained the constitutionality of a statute of Kentucky, forbidding the sale within that Commonwealth of oils or fluids used for illuminating purposes, and the product of coal, petroleum, or other bituminous substances, that would ignite at less than a certain temperature. Having a patent from the United States for an improved burning oil, Patterson claimed the right, by virtue of his patent, to sell anywhere in the United States

the oil described in it, without regard to the inspection laws of any State, enacted to protect the public safety. It was held that the statute of Kentucky was a mere police regulation, embodying the deliberate judgment of that Commonwealth that burning fluids, the product of coal, petroleum or other bituminous substances, which would ignite or permanently burn at less than a prescribed temperature, are unsafe for illuminating purposes. We said that the patent was not a regulation of commerce, nor a license to sell the patented article, but a grant that no one else should manufacture or sell that article, and, therefore, a grant simply of an exclusive right in the discovery, which the national authority could protect against all interference; that it was not to be supposed "that Congress intended to authorize or regulate the sale, within a State, of tangible personal property which that State declares to be unfit and unsafe for use, and by statute has prohibited from being sold or offered for sale within her limits;" also, that "the right which the patentee or his assignee possesses in the property created by the application of a patented discovery must be enjoyed subject to the complete and salutary power with which the States have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few." Now, the counsel of the State asks: If the State may, by the exercise of its police power, determine for itself what test shall be made of the safety of illuminating oils, and prohibit the sale of all oils not subjected to and sustaining such test, although such oils are manufactured by a process patented under the Constitution and laws of the United States, why may it not determine for itself what test shall be made of the wholesomeness and safety of food, and prohibit the sale of all such food not submitted to and sustaining the test, although it may chance that articles otherwise subject to the Constitution and laws of the United States cannot sustain the test? The analogy, the learned counsel observes, seems close. But it is only seemingly close. There is no real analogy between that case and the one before us. The

Kentucky statute prescribed no test of inspection which, in view of the nature of the property, was either unusual or unreasonable, or which by its necessary operation discriminated against any particular oil because of the locality of its production. If it had prescribed a mode of inspection to which citizens of other States, having oils designed for illuminating purposes, and which they desired to sell in the Kentucky market, could not have reasonably conformed, it would undoubtedly have been held to be an unauthorized burden upon interstate commerce. Looking at the nature of the property to which the Kentucky statute had reference, there was no difficulty in the way of the patentee of the particular oil there in question submitting to the required local inspection.

But a law providing for the inspection of animals whose meats are designed for human food cannot be regarded as a rightful exertion of the police powers of the State, if the inspection prescribed is of such a character, or is burdened with such conditions, as will prevent altogether the introduction into the State of sound meats, the product of animals slaughtered in other States. It is one thing for a State to exclude from its limits cattle, sheep or swine, actually diseased, or meats that, by reason of their condition, or the condition of the animals from which they are taken, are unfit for human food, and punish all sales of such animals or of such meats within its limits. It is quite a different thing for a State to declare, as does Minnesota by the necessary operation of its statute, that fresh beef, veal, mutton, lamb or pork — articles that are used in every part of this country to support human life — shall not be sold at all for human food within its limits, unless the animal from which such meats are taken is inspected in that State, or, as is practically said, unless the animal is slaughtered in that State.

One other suggestion by the counsel for the State deserves to be examined. It is, that so far as this statute is concerned, the people of Minnesota can purchase in other States fresh beef, veal, mutton, lamb and pork, and bring such meats into Minnesota for their own personal use. We do not perceive

that this view strengthens the case for the State, for it ignores
the right which the people of other States have in commerce
between those States and the State of Minnesota.   And it
ignores the right of the people of Minnesota to bring into
that State, for purposes of sale, sound and healthy meat,
wherever such meat may have come into existence.   But there
is a consideration arising out of the suggestion just alluded to
which militates somewhat against the theory that the statute
in question is a legitimate exertion of the police powers of the
State for the protection of the public health.   If every hotel-
keeper, railroad or mining corporation, or contractor, in Min-
nesota, furnishing subsistence to large numbers of persons, and
every private family in that State, that is so disposed, can,
without violating this statute, bring into the State from other
States and use for their own purposes, fresh beef, veal, mutton,
lamb and pork, taken from animals slaughtered outside of
Minnesota which may not have been inspected at all, or not
within twenty-four hours before being slaughtered, what
becomes of the argument, pressed with so much earnestness,
that the health of the people of that State requires that they
be protected against the use of meats from animals not in-
spected in Minnesota within the twenty-four hours before
being slaughtered?   If the statute, while permitting the sale
of meats from animals slaughtered, inspected and "certified"
in that State, had expressly forbidden the introduction from
other States, and their sale in Minnesota, of all fresh meats,
of every kind, without making any distinction between those
that were from animals inspected on the hoof and those that
were not so inspected, its unconstitutionality could not have
been doubted.   And yet it is so framed that this precise result
is attained as to all sales in Minnesota, for human food, of
meats from animals slaughtered in other States.

In the opinion of this court the statute in question, so far as
its provisions require, as a condition of sales in Minnesota of
fresh beef, veal, mutton, lamb or pork for human food, that
the animals from which such meats are taken shall have been

inspected in Minnesota before being slaughtered, is in violation of the Constitution of the United States and void.

*The judgment discharging the appellee from custody is affirmed.*