DONALD v. SCOTT et al. Ex parte SCHNEIDER. Ex parte EBERHARD. Ex parte WOLTERS.

(Circuit Court, D. South Carolina. June 4, 1896.)

CONSTITUTIONAL LAW—INTOXICATING LIQUORS—INTERSTATE COMMERCE.

The South Carolina statute of April 1, 1896, declares that all intoxicating liquors which are not purchased of a state officer authorized to sell the same, and which have not been tested by the chemist of South Carolina College, and found to be chemically pure, are of a poisonous and detrimental character, and that their use as a beverage is against the morals, good health, and safety of the state. It forbids the accepting, storing, and keeping possession thereof, and makes it unlawful for any consignee or other person to take from any depot or place, or to pay freight, express, or other charges thereon, and authorizes their seizure by state officers whenever found. *Held* that, in so far as this act is applied to

liquors sent into the state from other states, it is void, as an interference with interstate commerce.

These were three separate petitions, filed, respectively, by William J. Schneider, William Eberhard, and H. Joseph Wolters, in the main cause of James Donald against J. M. Scott and others, charging certain state constables with contempt for violating the injunction heretofore issued by this court in the main cause, by seizing and confiscating certain spirituous liquors, imported by the petitioners, respectively, from outside the state.

W. Gibbes Whaley, for Schneider.

J. P. K. Bryan, for Eberhard and Wolters.

Wm. A. Barber and C. P. Townsend, for respondents.

SIMONTON, Circuit Judge. These three petitions were filed in the main cause. The petitioner first named had purchased and paid for, in Augusta, Ga., on May 8, 1896, for his own personal use, two gallons of rye whisky, shipped and delivered to him by the Southern Express Company at Charleston, and after such delivery seized in his possession by a state constable on April 10, 1896. The petitioner Eberhard, a watchmaker by trade, purchased, for his own personal use and consumption in Savannah, Ga., a case of Mt. Vernon whisky, a product of the state of Pennsylvania, and caused the same to be shipped to his residence in Charleston via the Charleston & Savannah Railroad, and while the same was in transit it was seized by two state constables, J. M. Scott and John Strobel, and confiscated. The third petitioner claims to have been the owner of one barrel of prime Zinfandel claret wine, product of the state of California, shipped to him by steamship from New York to Charleston, the same being for his own personal use and consumption, and not for the purpose of barter, trade, sale, or exchange within the state of South Carolina, and while the same was on the docks of the steamship line it was seized and carried away by Harling and Livingston, state constables. The petitioners each charge that the seizure in his case was a violation of the order of this court, and in contempt thereof. Rules were issued upon the filing of the petitions, to each of which an answer and return have been filed. The circumstances attending the seizure differ somewhat in each case. But each of the returns sets up, in justification of the seizure, the act of the general assembly of the state of South Carolina, approved April 1, 1896, entitled "An act to provide for the election of a state board of control, and to further regulate the sale, use, consumption, transportation and disposition of intoxicating and alcoholic liquors or liquids in the state, and prescribe further penalties for violation of the dispensary laws, and to police the same."

The petition first named was filed avowedly to test the law thus passed. The attorney general of South Carolina, in an argument characterized by great ability and by corresponding fairness, has directed the attention of the court to that point, and it will be first decided. The question is: Is this act of assembly a lawful

exercise of the police power of the state? What is the motive and purpose of the act? In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. Henderson v. Mayor, etc., 92 U. S. 259. "The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments." Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730. The fact that the statute on its face declares that it is an exercise of the police power is not enough to make it so. "If a statute purporting to have been enacted to protect the public health, public morals, or public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of courts so to adjudge and thereby give effect to the constitution." Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273. A state cannot, under the guise of exerting its police powers, or of enacting inspection laws, make discrimination against the product and industries of some of the states in favor of the products and industries of its own or other states. Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213. "A state cannot make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease, and to cure the sick, an inspection law, within the constitutional meaning of that term, by calling it so in the title." People v. Compagnie Générale Transatlantique, 107 U. S. 59, 2 Sup. Ct. 87. These require an examination into and analysis of the act of assembly.

One of the purposes of the act, as disclosed in its title, is to further regulate the sale, use, consumption, transportation, and disposition of intoxicating and alcoholic liquors or liquids in the state. This treats such liquors or liquids as an article of commerce, as unquestionably they are. The first section, then, forbids the manufacture, sale, barter, exchange, receipt, or acceptance for unlawful use, delivery, storing, and keeping in possession within the state of any spirituous, malt, vinous, fermented, brewed (whether lager or rice beer), or other liquids, or any compound or mixture thereof, by whatever name called or known, which contains alcohol and is used as a beverage by any person, firm, or corporation. It then declares it unlawful in any consignee or other person to take from the depot or other place, or to pay freight or express or other charges thereon, by anyone, of any such liquids, except as hereinafter provided, under a penalty of imprisonment in the penitentiary, or a fine, or both, in the discretion of the court, for each offense. All such liquors are declared to be contraband, and against the morals, good health, and safety of the state, except when bought from a state officer authorized to sell the same, or in possession of one, and having been tested by the chemist of the South Carolina College, and found to be chemically pure. The section further declares that all alcoholic liquors not having been tested by the chemist of the South Carolina College, and found to be chemically pure, are of a poisonous and detrimental character, and their use and consumption as a beverage are against the mor-

als, good health, and safety of the state, and that such liquors may be seized wherever found without a warrant, and turned over to the state commissioner.

It will be observed that, under this section, alcoholic liquors or liquids are not in themselves declared to be deleterious. Nor is the use of them as a beverage declared or treated as against the morals, good health, or safety of the state. The absence of a certificate of the chemist of the South Carolina College, and the purchase from one not a state officer authorized to sell the same, or out of his possession, work this result. And only those alcoholic liquors which have not the test of this chemist are to be of a poisonous and detrimental character, and against the morals, good health, and safety of the state, whatever may be, in fact, their real purity. Why, then, are these conditions imposed,—the sale only by a state officer, and the certificate of the chemist of the South Carolina College? The attorney general says that this is an inspection law. Upon examining the act no provision is found for an inspection of spirituous liquors by the chemist of the South Carolina College, except when instructed to do so by the state board of control, and then only of such liquors as they shall purchase for use in the state; none making it his duty to inspect for anyone else; none fixing his fees. He is not a state officer, but a professor in the college, having duties connected with his office, which may or may not engross his time. The act declares alcoholic liquors which do not bear a certificate of test by the chemist of the South Carolina College poisonous, and injurious to the welfare, good health, and safety of the state, solely because of the absence of the certificate. No other reason whatever is given. At the same time it omits to make it the duty of this chemist to inspect and test alcoholic liquors except when they are purchased for or by the state board of control. He may refuse to make any test of any other liquors. He can lawfully do so, and he cannot be compelled to act otherwise. He may consent to make the test, but he can impose terms which would be prohibitory. The natural and reasonable effect of the act is to exclude from the state entirely all other liquors whatever. Its direct result is to put in the hands of the state board of control the right to dictate who may or who may not import into the state these goods, and to shut out every one who does not meet their approval. The necessary consequence of its enactment is to burden, and in great measure impair, commerce in this article between citizens of this state and other states. Indeed, if by implication it be held that the state chemist could test other liquors than those bought by the state board of control, the fact that such liquors must be brought to him within the state, and must be transported through the state, before the test can be made, liable at once to seizure and confiscation, because not yet tested, effectually prevents any such test and inspection by him.

It has been doubted by no less an authority than Mr. Justice Bradley whether inspection laws can be intended for any other purpose than the inspection of articles to be exported from a state. Voight v. Wright, 141 U. S. 64, 11 Sup. Ct. 855. But, be this as

it may, an inspection law must be fair, equal, and in no way discriminating in favor either of persons or of property. Id. It cannot be used as a preventive to the importation of articles of the same class with those which it either permits or assists, nor to promote a monopoly. Foster v. Master & Wardens of Port of New Orleans, 94 U. S. 248. It is manifest that this is not an inspection law in this sense, but rather an effort, under the guise of an inspection law, to impose a burden on commerce. And when, in connection therewith, is taken the provision that, even with a certificate of such a test, the sale is contraband unless made by a state officer, it is difficult to avoid the conclusion that both of these conditions were made to exclude all competition from abroad, and to secure in the state the monopoly in the sale of intoxicating liquors, and not to regulate their purchase and use by her citizens.

Is this a lawful exercise of the police power? Whether the act assumes to be an exercise of the police power or not, it is the duty of the court to inquire, with respect to this act, not only whether there is a real or substantial relation between its avowed object and the means devised for attaining those objects, but whether, by its necessary or natural operation, it impairs or destroys rights secured by the constitution of the United States. Minnesota v. Barber, 136 U. S. 320, 10 Sup. Ct. 862. This act excludes all competition in the trade of intoxicating liquors from abroad. The state of Minnesota passed an act "for the protection of the public health, by providing for inspection before slaughter of cattle, sheep and swine, designed for slaughter for human food." The most ample provision was made for such an inspection by the appointment of inspectors in every city, village, borough, or township, and the duties of these inspectors were carefully prescribed. No sale could be made of slaughtered cattle without a certificate from such inspectors, and the certificate was full and minute. The supreme court of the United States held that the result of the statute, whatever may have been its purpose, was to deny altogether to citizens of other states the privilege of importing cattle slaughtered outside of the state, and that it thus fettered commerce among the states, and was void. Minnesota v. Barber, 136 U. S. 323, 10 Sup. Ct. 862. The court further held that the constitutionality of the act was not preserved because it applied alike to the people of all the states, including the people of the state enacting the statute.

The act now in question secures in the state board of control a monopoly in the import and sale of intoxicating liquors, however chemically pure they may be. The constitution of the United States secures to the citizens of every one of the United States privileges enjoyed in every other state. They cannot be discriminated against by state legislation. To them commerce between the states must be free. All legislation, therefore, putting citizens of other states at a disadvantage in any state, because they are citizens of other states, is void. Any local regulation which, in terms or by its necessary operation, denies equality in the mar-

kets of the state, is, when applied to the people and products or industries of other states, a direct burden upon commerce among the states, and therefore void. Brimmer v. Rebman, 138 U. S. 82, 11 Sup. Ct. 213. Nor can it in principle make any difference if this equality is denied to citizens of other states because the state herself, through certain agents, engages in the competing business, and asserts her monopoly in it. She may forbid the business altogether, or she may forbid her citizens from carrying it on except upon conditions and restrictions, however stringent. No citizen of any other state can claim greater privileges than her own citizens. But when she herself conducts the business, through her agents all over the state, and takes the place of her citizens, she cannot, by thus coming into competition with citizens of other states, destroy their competition by denying them the right to trade in the same commodity in every respect like that in which she is trading, save that it is not protected by a certificate which she alone can give, and which she distinctly withholds.

The present act gives to certain persons (the board of control) the sole power of purchasing and importing into this state an article recognized everywhere as an article of commerce. The monopoly is vested in them by provisions of such stringency, secured by such extraordinary sanctions, that every other person and all citizens of other states are absolutely deprived of competition with them. Thus the products as well as the citizens of other states are discriminated against, and the interstate commerce is destroyed. The act in question is in conflict with the constitution and laws of the United States, and can afford no protection to the respondents for their action, which they claim is based upon it. The rules are made absolute.