THE COURT.
On the petition for rehearing onr attention is directed to the Act of Congress commonly known as the Lacey Act, approved May 25, 1900, entitled “An Act To enlarge the powers of the Department of Agriculture, prohibit the transportation by interstate commerce of game killed in violation of local laws, and for other purposes” (31 Stats, at L., p. 187 et seq.).
While it is not the usual practice to consider, on application for rehearing, points not previously urged, we are probably justified in doing so when, as here, the validity of a state statute is involved. Moreover, on further consideration we think it proper to pursue certain inquiries which in our original opinion we had not for the purposes of this case deemed necessary. The act referred to has been recast, and, in its present form, appears as section 701 of title XVI and sections 391 to 395, both inclusive, of title XVIII, United States Code. Certain, though not all of the functions originally invested by the act in the Department of Agriculture have now been transferred to the Department of the Interior.
Said section 701 of title XVI recites that:
“The object and purpose of this section and sections 391-393, 394 and 395 of Title XVIII, is to aid in the restoration of such” (game and wild) “birds in those parts of the United States adapted thereto where the same have become scarce or extinct, and also to regulate the introduction of American or foreign birds or animals in locations where they have not heretofore existed.”
These statutory provisions are, as we understand the contention, relied on by the prosecution as evincing the purpose on the part of Congress of leaving to the states, in the exercise of their police powers, the regulation of the possession of all game imported from outside their limits notwithstanding that some such game as, for example, lobsters and shellfish generally, are, as noted in our original opinion, expressly recognized by federal statute as a legitimate subject of commerce, and spiny lobster specifically so by section 786 of the California Fish and Game Code.
In Gibbons v. Ogden, 9 Wheat. (U.S.), 1, 200 [6 L.Ed. 23], Chief Justice Marshall defined the issues there involved by saying that:
*937 “The sole question is, can a state regulate commerce with foreign nations and among the states, while Congress is regulating it?”
And his answer was, No. It was, however, in that case recognized that the states might legitimately pass and enforce reasonable inspection laws affecting imports, notwithstanding that commerce as such was at the same time being regulated by Congress.
The court said (p. 203):
“But the inspection laws are said to be regulations of commerce, and are certainly recognized in the constitution as being passed in the exercise of a power remaining with the states.
“That inspection laws may have a remote and considerable influence on commerce will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived, cannot be admitted. The object of inspection laws is to improve the quality of articles produced by the labor of a country; to fit them for exportation; or it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation, which embraces everything within the territory of a state, not surrendered to a general government; all of which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike-roads, ferries, etc., are component parts of this mass.
“No direct general power over these objects is granted to congress; and, consequently, they remain subject to state legislation.”
In other words, the power to regulate commerce among the states and with foreign nations emanates from the express grant in the federal Constitution, whereas the power to pass and enforce inspection laws is referable to the reserved powers of the states, The court recognized that Congress in regulating interstate commerce, and the state in passing laws on “subjects acknowledged to be within its control” and with a view to those subjects, might adopt measures of substantially the same character, but noted that in such event, while the one which Congress might adopt would derive its authority *938 from the Constitution, the one adopted by the state would not derive its authority from any particular granted power but rather from the residual power of the state, and went on to say:
“All experience shows that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers; but this does not prove that the powers themselves are identical.”
It was further noted that the measures adopted respectively by the federal and state governments, in pursuance of these distinct powers might be harmonious with each other, but that where conflicting or mutually destructive, that of the state must give way, because of the provision of the federal Constitution making it and statutes enacted under its authority the supreme law of the land. In Brown v. Maryland, 12 Wheat. (U.S.) 419, 446 [6 L.Ed. 678], Chief Justice Marshall again asked:
“What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several States?”
He answered:
"This question was considered in the case of Gibbons v. Ogden, 9 Wheat. 1 [6 L.Ed. 23], in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the constitution. The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior.”
As said in Schollenberger v. Pennsylvania, 171 U.S. 1, p. 12 [18 S.Ct. 757, 43 L.Ed. 49]:
“The general rule to be deduced from the decisions of this court is that a lawful article of commerce cannot be wholly excluded from importation into a State from another State where it was manufactured or grown. A State has power to regulate the introduction of any article, including a food product, so as to insure purity of the article imported, but such police power does not include the total exclusion even of an article of food.
“In Minnesota v. Barber, 136 U.S. 313 [10 S.Ct. 862, 34 L.Ed. 455], it was held that an inspection law relating to an article of food was not a rightful exercise of the police power of the State if the inspection prescribed were of such a character or if it were burdened with such conditions as would wholly prevent the introduction of the sound article from *939 other States. This was held in relation to the slaughter of animals whose meat was to be sold as food in the State passing the so-called inspection law. The principle was affirmed in Brimmer v. Rebman, 138 U.S. 78 [11 S.Ct. 213, 34 L.Ed. 862], and in Scott v. Donald, 165 U.S. 58, 97 [17 S.Ct. 265, 41 L.Ed. 632].”
These observations would be applicable a fortiori where the interference by the state was not merely with interstate but also foreign commerce.
It is said in an article on the subject in 53 Harvard Law Review (pp. 1185-6):
“One focal point of. danger to national trade, inviting the extended use of federal powers, is created by state enactment of food inspection laws. Although the necessity of state action to preserve the health of its citizens has led the Supreme Court to take a liberal view of the state power to inspect products coming from other states or foreign countries, some limitations have been imposed. The state may not levy an inspection tax on the introduction of extra-state goods which discriminates against those goods because of their origin.” (Citing Sale v. Bimco Trading, Inc., 306 U.S. 375 [59 S.Ct. 526, 83 L.Ed. 771]; Voight v. Wright, 141 U.S. 62 [11 S.Ct. .855, 35 L.Ed. 638]; and Brimmer v. Rebman, 138 U.S. 78 [11 S.Ct. 213, 34 L.Ed. 862].) “Nor may it draw its inspection laws so that it is physically impossible for an extra-state producer to meet local requirements.” (Citing Minnesota v. Barber, supra, and Foster etc. Packing Co. v. Haydel, supra, referred to in our original opinion.)
The question, then, with which we have to deal in the case at bar is whether there is or is not any real conflict between the recognition of lobsters and shellfish generally as legitimate articles of commerce and the inhibitions attempted by section 786.5 of the California Fish and Game Code, and it seems to us that an inhibition directed against the importation of a commodity so recognized as a legitimate article of commerce merely because, when imported, it is cooked exhibits such a conflict with the policy of Congress as expressed in paragraph 1761, section 1201, title XIX, United States ,y Code, that it cannot stand unless some ground can be found. ' for resolving the conflict. As we saw, the claim is now made and it is that claim which we are at this point considering, that Congress itself has thrown wide the door for the type of legislation here involved by the Lacey Act as now revamped *940 and in force. The claim that an intention to leave the door open for such state legislation as is here involved can be elicited from the above cited provisions of titles XVI and XVIII of the United States Code is presumably based on the language of section 395 of the latter which reads as follows:
“Dead Bodies of Game Animals ob Game ob Song Birds, Subject to Laws of State. All dead bodies, or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies, or parts thereof, of any wild game animals, or game or song birds transported into any State or Territory, or remaining therein for use, consumption, sale, or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such “animals or birds had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise.” (Emphasis added.) .
Even if the expression “game animals,” as used in this enactment, is to be taken to include shellfish, such as spiny lobster, which is at least doubtful, it seems to us that the above emphasized language “to the same extent and in the same manner as though such animals or birds had been produced in such State or Territory, ’ ’ is enough not only to negative any such claim but to indicate the contrary.
It is true that there are other grounds than the purity of an article, as a food product, on which state legislation regulating its admission may be allowed, such for example, in the case of game, as the protection of domestic game, though, as noted in our original opinion, when the state recognizes game of a particular kind as a permissible article of commerce it thereby disables itself from wholly excluding it.
But we think it clear that section 786.5 of the California Fish and Game Code was not designed for the protection of local spiny lobster. It has no connection with our seasonal restrictions on taking them. It purports by its terms to apply even to spiny lobster, if cooked and uncanned, imported during what is in California the open season. If, however, it be claimed that spiny lobster when cooked cannot be satisfactorily measured and, therefore, that to allow the possession here of *941 cooked but uncanned spiny lobster brought from elsewhere would impede the enforcement of local laws against the taking of spiny lobster of either larger or smaller sizes than those here allowed, the obvious answer is that the same argument would be applicable to the possession here of such spiny lobster cooked in California, and therefore that the exclusion of the product when cooked elsewhere is no aid in enforcing our regulations as to the size of such lobster that may be taken. Accordingly, no question of power reserved to the state to protect its own game is, in our opinion, here involved.
The legislation under attack must be sustained, therefore, if it can be sustained at all, as an exercise of the police power of the state in aid of sanitation, but in our opinion it cannot be so sustained. Spiny lobster cannot be used for human consumption unless it is cooked. It is true that section 785 of the Fish and Game Code undertakes to make it unlawful to pickle, can, or otherwise preserve any spiny lobster, or to sell any spiny lobster meat not in the shell. Since, however, as just observed, spiny lobster in order to be used as human food at all must be cooked, it is apparent that it could not have been the legislative intent by section 785 to forbid its being cooked in California. We therefore have a bald distinction in section 786.5 between the possession in California of spiny lobster cooked here and the possession in California of spiny lobster cooked elsewhere. It is obvious that spiny lobster is not intrinsically any more wholesome because cooked in California rather than somewhere else. If, as in the ease of canned lobster, section 786.5 of our Fish and Game Code had forbidden possession or sale of uncanned, cooked lobster imported into California, unless cooked “under the supervision of the Department of Agriculture or other corresponding department of any other state or nation,” an entirely different question would be presented. So, also, would a different question be presented if the State of California had set up, within its borders, some system of its own for supervising the cooking of spiny lobster, to make sure that lobster long dead or otherwise unwholesome were not cooked and had then forbidden lobster to be imported in a ready cooked condition because not cooked under California inspection. That would be a case somewhat similar to Witt v. Klimm, 97 Cal.App. 131 [274 P. 1039], referred to in our original opinion. But that is not this case. Here, the State of Cali *942 fornia, having instituted no supervision of its own of the cooking of spiny lobster here, and having provided no means of ascertaining that spiny lobster are here cooked under sanitary conditions, undertakes baldly to say that spiny lobster shall not be possessed here if cooked elsewhere, whatever supervision may have been exercised over the article cooked or the cooking process elsewhere.
In our view such arbitrary interference on the part of the state with the importation of spiny lobster is in conflict with the recognition by Congress of seafoods as legitimate subjects of interstate commerce and cannot be upheld.
The petition for rehearing is denied.