## SEELIG v. BALDWIN, Commissioner of Agriculture and Markets, et al.

District Court, S. D. New York.
Aug. 2, 1934.

Henry S. Manley, of Albany, N. Y., and Henry Epstein, of New York City, for defendants.

L. HAND, Circuit Judge.

This case comes up before a special court constituted under section 380, of title 28, of the U. S. Code (28 USCA § 380), to enjoin the defendants from enforcing section 258-m (4) of article 21-A of the Agriculture and Markets Law of the state of New York (Consol. Laws, c. 69), enacted April 1, 1934, and an order of the Milk Control Board of the State issued July 1, 1933, under an earlier act of the same purport. The plaintiff is a milk dealer who buys its supplies in Fairhaven, Vermont, principally from the Seelig Creamery Company. The majority of the shares of the two companies are owned by the same persons, although the companies themselves are separate. The creamery buys its milk of Vermont farmers, and sells it to the plaintiff in Vermont in cans, which the plaintiff ships by rail to the City of New York. Some of the milk the plaintiff sells direct in the cans delivered to it by the creamery company; some it bottles and distributes to its customers in that form. The State of New York has created a system of price control over the sale of milk, in pursuance of which it has provided that, so far as such a prohibition is constitutionally lawful, no milk shall be sold within the state which is bought outside at prices less than those fixed for the purchase of milk from farmers within the state. This is section 258-m (4) and is quoted in the margin.[1] Under an identical section, viz., section 312 (g) of article 25, enacted in the year 1933 (Laws 1933, c. 158), the Milk Control Board of New York on July 1, 1933, passed an order construing this language by forbidding the continuous purchase of milk outside the state, followed by its use within the state, if the milk was bought for less than the minimum price fixed for purchase within the state. This order is likewise quoted in the margin;[2] and remained in force after the pas-

J. J. O'Connor, of New York City, for plaintiff.

[1] It is the intent of the legislature that the instant, whenever that may be, that the handling within the state by a milk dealer of milk produced outside of the state becomes a subject of regulation by the state, in the exercise of its police powers, the restrictions set forth in this article respecting such milk so produced shall apply and the powers conferred by this article shall attach. After any such milk so produced shall have come to rest within the state, any sale, within the state by a licensed milk dealer or a milk dealer required by this article to be licensed, of any such milk purchased from the producer at a price lower than that required to be paid for milk produced within the state purchased under similar conditions, shall be unlawful.

[2] Any continuous and regular purchase or sale or delivery or receipt of milk passing to a milk dealer at any place and

sage of the law of 1934. The defendant Baldwin is Commissioner of Agriculture & Markets, and the successor in function to the Milk Control Board; he has refused to issue a license to the plaintiff to sell milk in New York, unless it agrees to obey all orders of the former board and of himself, including that just mentioned. The plaintiff has refused, asserting among other things that the act and the order in conjunction are an unconstitutional interference with interstate commerce. It now moves for an injunction pendente lite, to which the defendants counter with a motion to dismiss the bill. The defendants, other than Baldwin, are the Director of the Division of Milk Control; the Attorney General and the District Attorney of the County of New York. The first is alleged to be acting in conjunction with the commissioner, and the others to be threatening to prosecute the defendant for selling milk without a license.

■■ The jurisdiction of this court is conceded and indubitable, except that a question is raised whether the constitutionality of the act is at stake as contrasted with its interpretation. The argument is, that since it expressly confines its ambit to such subject matter as is constitutionally within the state's power, there cannot be a conflict between it and the Constitution; ex vi termini the legislature stops exactly where, if it went further, its action would be forbidden. We should doubt whether this could · avoid the issue of constitutionality; since the act professes to go as far as it can, its interpretation involves the meaning of the Constitution. Be that as it may, such a statute, strictly speaking, enacts nothing but a hypothesis, and is necessarily brutum fulmen until some official supplies the condition by enforcing it in a concrete instance. When as here he does so by a regulation, the constitutionality of his act must be passed on by a court organized under section 380 of title 28, U. S. Code (28 USCA § 380). Then at any rate the issue becomes one of the constitutionality of the regulation. We proceed to the merits.

■■ The doctrine was not a priori inevitable that, even though Congress had not exercised its paramount power, the states might not in the management of their internal affairs impinge upon interstate commerce. Cf. License Cases, 5 How. 504, 12 L. Ed. 256. Section 8 of article 1, merely conferred powers on Congress; it forbade nothing; it was section 10 alone that took away the states' powers, and though part of it did indeed deal with the same subject-matter, it was very limited in scope. It might have been held that this was the measure of the states' incapacity until Congress chose to act. But the contrary is now so thoroughly established as to need little citation, and the question is always whether the state has "directly" regulated interstate commerce. The Minnesota Rate Cases, 230 U. S. 352, 396, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; State of Missouri v. Kansas Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027. Section 258-m (4) does not forbid the importation of milk into New York from outside; it merely prevents its sale when it gets there, unless it has been bought at the price which must be paid for similar milk in New York. Conceivably such a regulation might have been held to touch interstate commerce only "indirectly," and thus to be lawful until Congress stepped in. But again the opposite view prevailed; it is a "direct" restraint to forbid sale after the goods arrive, provided they are still a part of interstate commerce. Brown v. Maryland, 12 Wheat. 419, 447, 6 L. Ed. 678; Leisy v. Hardin, 135 U. S. 100, 111, 10 S. Ct. 681, 34 L. Ed. 128; Schollenberger v. Pennsylvania, 171 U. S. 1, 22, 18 S. Ct. 757, 43 L. Ed. 49; Savage v. Jones, 225 U. S. 501, 520, 32 S. Ct. 715, 56 L. Ed. 1182; State of Missouri v. Kansas Gas Co., supra, 265 . U. S. 298, 44 S. Ct. 544; 68 L. Ed. 1027. Moreover, although for fiscal purposes the doctrine of the unbroken package no longer fixes the term of interstate commerce (Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 67 L. Ed. 1095), when the issue is of the state's general municipal power over goods going to, or coming from, another state, we understand that the doctrine of Brown v. Maryland, supra, 12 Wheat. 419, 6 L. Ed. 678, still obtains. Leisy v. Hardin, supra, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128; Schollenberger v. Pennsylvania, supra, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49; Austin v. Tennessee, 179 U. S. 343, 348, 21 S. Ct.

available for utilization as fluid milk and/or cream within New York State, followed by such utilization in one or more instances, where the price involved in such purchase or sale or delivery or receipt is less than the sum of the minimum price established to be paid to producers for such milk plus actual costs of transporting and handling and processing such milk to the place and to the condition involved in such purchase or sale or delivery or receipt, hereby is forbidden.

132, 45 L. Ed. 224; Price v. Illinois, 238 U. S. 446, 454, 455, 35 S. Ct. 892, 59 L. Ed. 1400; Hebe Co. v. Shaw, 248 U. S. 297, 304, 39 S. Ct. 125, 63 L. Ed. 255. Whatever may be thought of so accidental a measure for the distribution of governmental powers, in view of the recent approval of the doctrine, it does not seem to us that an inferior court is free to treat it as open to debate. So far as we are to have a more realistic canon, it must be worked out step by step by the Supreme Court. It is true that in Austin v. Tennessee, supra, that court refused to accept the doctrine with verbal rigidity. Moreover, if the goods do not come in packages at all, there may be a substitute step by which they pass into the domestic stock of goods. Public Utilities Commission v. Landon, 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577; Pennsylvania Gas Co. v. Public Service Commission, 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; State of Missouri v. Kansas Gas Co., supra, 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027. For instance in the case of moving picture films, though not boxed, the critical event is their exhibition. Mutual Film Corporation v. Ohio Industrial Co., 236 U. S. 230, 241, 35 S. Ct. 387, 59 L. Ed. 552. None of the exceptions need, however, concern us here as to the milk sold by the plaintiff in the original cans; these are bona fide unbroken packages; they are still a part of interstate commerce, and the state has no power to forbid their sale unless by virtue of some excuse, of which more in a moment. As to the bottled milk, the opposite is true; the state may control it at its pleasure; it is part of the mass of its domestic goods; and although in so doing the state in effect fixes the price at which the milk shall be bought elsewhere, the sanction is local, and it is otherwise unobjectionable. Save for her federal duties, New York might forbid the entry of Vermont milk altogether, if she thought such milk likely to break down her policy of protecting her farmers or of securing a steady supply for her people.

Generally the power of the states has been said to rest solely upon the two questions we have already mentioned; that is, whether the goods are still in interstate commerce and whether the statute "directly" affects it. The accepted theory certainly is that the power does not depend upon the purposes which the state may have in mind; the concept is morphological rather than functional. But there are some decisions which it is very hard to fit into that pattern, which seem to turn not so much upon where the statute intervenes in the economic history of the goods, or how diffuse its effect may be when it does, as upon what is the justification for any intervention at all. One of these is Silz v. Hesterberg, 211 U. S. 31, 43, 29 S. Ct. 10, 53 L. Ed. 75; where the entry of game from elsewhere was prohibited as an incident to the protection of the local game supply. Certainly the act impinged as directly as possible upon the movement of foreign game which entered in its original wrappings; we can see no other explanation than that the purpose justified the power. It is possible to explain Geer v. Connecticut, 161 U. S. 519, 16 S. Ct. 600, 40 L. Ed. 793, on another theory; that is, that the embargoed game had not yet become separated from the mass of local goods, and that interstate commerce had therefore not commenced. But that was not the ground on which it proceeded, any more than it was the ground of Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835, which must stand like the game cases as an instance where the purpose excused. Besides, it is not always true that goods must have started upon their interstate movement, or be even segregated for that purpose, before they enter interstate commerce. Oklahoma v. Kansas Nat. Gas Co., 221 U. S. 229, 255, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Lemke v. Farmers' Grain Co., 258 U. S. 50, 55, 56, 42 S. Ct. 244, 66 L. Ed. 458; Pennsylvania v. West Virginia, 262 U. S. 553, 598, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300; Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147. Hall v. Geiger-Jones Co., 242 U. S. 539, 557–559, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643, may indeed be distinguished, because although the court expressly refused to find that the securities had become part of the local mass of goods, it dealt with the statute as an inspection law, like Plumley v. Massachusetts, 155 U. S. 461, 15 S. Ct. 154, 39 L. Ed. 223; Crossman v. Lurman, 192 U. S. 189, 24 S. Ct. 234, 48 L. Ed. 401; Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U. S. 345, 18 S. Ct. 862, 43 L. Ed. 191; Savage v. Jones, supra, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182, and many others. In such cases although the state lays its hand directly upon goods while in interstate commerce, yet if it does so only to determine whether they are sound, or truly marked, or the like, it has that power. The recognition of inspection laws in section 10, art. 1 seems to imply as much. It could indeed be argued that as

inspection presupposes a standard to which the goods must conform, and power to exclude them if they do not, the state ought to be able to enforce standards that demand no inspection. This is perhaps no more than to argue that the recognition of the validity of inspection laws proves that the states had general powers except as denied in section 10. Be that as it may, inspection laws have historically an ascertainable, if a somewhat vague, meaning; they may be valid merely as an expressed exception, and it is so that they must be regarded unless much else is to be treated as not seriously spoken. Hannibal & St. J. Railroad Co. v. Husen, 95 U. S. 465, 473, 24 L. Ed. 527; Brimmer v. Rebman, 138 U. S. 78, 11 S. Ct. 213, 34 L. Ed. 862; Vance v. Vandercook, 170 U. S. 438, 455, 456, 18 S. Ct. 674, 42 L. Ed. 1100; Reid v. Colorado, 187 U. S. 137, 151, 152, 23 S. Ct. 92, 47 L. Ed. 108. Foster-Fountain Packing Co. v. Haydel, supra, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147, perhaps depended upon the discrimination which the state was attempting, in which it was like Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 34 L. Ed. 455. The effort was to secure a monopoly of the shelling of the state's shrimps, just as in Minnesota v. Barber it was to obtain a monopoly of butchering meat. But the discriminatory effect of the law was not pressed, and the decision seems rather to rest upon the fact that unlike Geer v. Connecticut, supra, 161 U. S. 519, 16 S. Ct. 600, 40 L. Ed. 793, the state had relinquished all interest in the shellfish, and that its only other possible motive, i. e., to establish an industry, was no excuse.

We do not think that it is necessary to go further than suggest from these cases that the venture on which the state is engaged may at times excuse its interference; that its intervention is not always condemned because it interposes "directly" upon the goods while they are still a part of interstate commerce. Assuming for argument that there may be such instances, the motive in the case at bar will not serve. We do not of course mean that the plan is not commendable in itself, or that the means are not well adapted to the end. Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, has authoritatively settled the state's power, and it is easy to see how the whole scheme might be imperilled, and conceivably wrecked, unless foreign milk, bought at cut prices, could be kept out of competition with the domestic supply. Furthermore, though a complete exclusion would give even greater security, it might have been open to a charge of unfair discrimination, which cannot be made as it is. The act does not try to circumscribe the "milk-shed" as equal competition defines it; it merely prevents price-cutting throughout its area. So put, there is much to be said for the propriety of the extraterritorial feature, and Congress might well be induced to sanction it as it stands. But that sanction is, we think, essential to its validity. The situation is indeed scarcely distinguishable at all from Schollenberger v. Pennsylvania, supra, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49, and so far as it is, presents a weaker case for the state's power. In that case the act was unsuccessfully defended as an inspection law, since oleomargerine might easily simulate real butter. But it had another side, like the milk here; the substitute was probably in fact prohibited only because it competed with dairymen; and though this was not argued, that was almost certainly because in 1898 the court would have at once rejected it. A fortiori the case at bar is therefore within that decision, for no pretence can here be made that this is an inspection law. Although the section in question may be a reasonable incident to the state's internal economic polity, nevertheless it seeks to protect a local industry by excluding foreign competing goods, and that is exactly the kind of activity against which the commerce clauses are primarily directed. Their occasion was the mutual jealousies and aggressions of the states, taking form in customs barriers and other economic retaliation. Farrand, Records of the Federal Convention, vol. 2, p. 308; vol. 3, pp. 478, 547, 548; The Federalist No. XLII; Curtis, History of the Constitution, vol. 1, pp. 289, 290; Story on the Constitution, § 259. The implied prohibition in section 8 is less definite than the express one in section 10, but so far as there may be any exceptions to it, based upon the purposes of the state, they cannot include the exclusion of competing goods because they compete. That at least is forbidden by the genesis of both clauses, and the express content of the second. No matter what the local need, as a nation we are without protective economic barriers between the states, certainly until Congress sees fit to allow them; and it makes no difference that they do not take the form of duties or imposts under section 10 of article 1. The state's intervention in the case at bar is indeed closely parallel in its result to a customs duty. Such a duty pro tanto secures the market to the local supply through the resulting rise in price; and that is the

807

avowed object of this law; it will allow no foreign milk to enter unless it has already cost enough to make sure that it must compete on equal terms. The Constitution denies to a state that kind of economic sanction, and puts it in the hands of the public authority charged with the national welfare. So far as the act attempts to prevent the import of milk in cans it is therefore invalid.

The motion to dismiss the bill is denied. An injunction pendente lite will be granted forbidding the defendants to exact from the plaintiff as a condition of granting a license any agreement not to sell milk in cans in New York which has been bought in Vermont at lower prices than those prescribed for the purchase of milk in New York. This opinion will stand as findings of fact and conclusions of law under Equity Rule 70½ (28 USCA § 723), unless objection is made.