(30 Misc. Rep. 130.)

### PEOPLE v. BUFFALO FISH CO., Limited.[1]

(Supreme Court, Special Term, Erie County.    July 11, 1899.)

1. CONSTITUTIONAL LAW—STATE FISHERIES ACT—REGULATION OF COMMERCE.
   Laws 1892, c. 488, §§ 110, 112, making it a misdemeanor to catch, kill, or have in one's possession certain varieties of fish during certain periods of the year, and imposing a penalty for the violation thereof, in as far as they affect the possession and right of sale by a citizen of this state of fish imported by him from a foreign country, on which a customs duty has been paid, are in conflict with the power of congress to regulate commerce, and to such extent are void.

2. SAME—DUE PROCESS OF LAW.
   Laws 1892, c. 488, §§ 110, 112, making it a misdemeanor for any one to have in his possession certain varieties of fish during certain periods of the year, and imposing a penalty for violation thereof, in so far as they affect the possession and sale of fish imported from without the state are unconstitutional, as depriving a person of his property without due process of law.

3. SAME—POLICE POWER.
   Such act cannot be upheld as a lawful exercise of the police power of the state, on the ground that its object is to provide for the propagation and preservation of game fish in the waters of the state.

4. SAME—VIOLATION—PENALTY—EXCEPTED WATERS.
   In proceedings for the enforcement of the penalty imposed by Laws 1892, c. 488, for catching, killing, or having in possession certain varieties of fish during certain periods of the year, but providing that the prohibition shall not apply to a part of the St. Lawrence river therein designated, and that the commissioners of fisheries, game, and forest may permit the taking or destruction of pickerel at any time in waters inhabited by trout, it is necessary to show that the fish were not taken under the excepted clauses of the statute, and that they were not the subject of commerce between the states or with foreign countries.

Action by the people against the Buffalo Fish Company, Limited, to recover penalties for violation of the fisheries, game, and forest laws.   Demurrer to defendant's answer overruled.

Hopkins & Bondy, for plaintiff.
Moot, Sprague, Brownell & Marcy, for defendant.

LAMBERT, J.   The defendant is a domestic corporation dealing in fish, having its principal place of business in the city of Buffalo. By authority duly conferred by statute, this action is brought in the name of the people to recover of the defendant the penalties provided in the fisheries, game, and forest laws for having in its possession certain pike, pickerel, bass, and muskellunge during the close season.   The complaint alleges that on or about the 25th day of March, 1898, in the city of Buffalo, the defendant wrongfully, unlawfully, and willfully, and contrary to and in violation of the provisions of section 110 of chapter 448 of the Laws of 1892, as thereafter amended, had in its possession 4 pike and 1 pickerel, and on the 23d day of April, 1898, had in its possession 16 bass and 4 pike, and on the same day, in violation of section 112 thereof, had in its possession two muskellunge, by reason of all which the defendant became indebted to the plaintiff for the penalties provided as aforesaid.   The defendant, answering, admits having the fish in

[1] Affirmed on appeal, see 62 N. Y. Supp. 1143.

its possession on the days mentioned in the complaint, but denies that it was wrongful or in violation of law, and, as an affirmative defense, alleges that the fish in question were fresh-water fish, caught and killed in the province of Manitoba, in the dominion of Canada; that it was not unlawful there to catch and kill the same; that they were duly purchased by the defendant in and from residents of the dominion of Canada, and brought into this country and the state of New York, under the privilege contained in the provisions of the tariff law, upon payment to the government of the United States of one-fourth of 1 per cent. per pound; and that the defendant, being a purchaser and importer of the fish in question, had the lawful right to the possession thereof, as an article of commerce, under the constitution and laws of the United States and the constitution of the state of New York. The answer further avers that the dealing in fish as an article of commerce has been regulated and provided for by the government of the United States and Great Britain in and by treaties and conventions and also by several acts of congress and customs regulations, and is now provided for by the tariff act known as the "Dingley Bill," passed in July, 1897. The plaintiff demurred to the answer on the ground "that said answer does not allege facts sufficient to constitute a defense to this action," and "that the new matter alleged in said answer is not sufficient in law upon its face to constitute a defense." The allegations of the answer are admitted by the demurrer, and the question is presented whether, as matter of law, the facts therein alleged show that the defendant was lawfully in possession of the fish in question.

Chapter 31 of the General Laws, being chapter 488 of the Laws of 1892, with the amendments thereto, was intended as a codification of all former laws of the state relating to the preservation of game, fish, and the care of forest preserves. Section 2 provides for the creation of a board of commissioners, and section 6 defines its duties, among which are to propagate and keep up the supply of fish in the various waters of the state, and the enforcement of all laws passed for the protection of fish and game. Sections 110 and 112 provide that it shall be a misdemeanor, and shall subject an offending party to penalties, to catch, kill, or have in his possession a certain variety of fish, including pike, pickerel, bass, or muskellunge, within specified periods. The prohibition against the catching, killing, or possession of fish, considered in connection with the elaborate provisions for its enforcement, indicates that the object and intent of the legislature is to provide for the propagation and preservation of fish in the waters of the state; and, to conserve that end, the possession of fish during the close season is made unlawful.

The leading case in this state involving the questions presented in the record now being considered is Phelps v. Racey, 60 N. Y. 10. That was an action to recover penalties from the defendant for having in his possession certain game birds in violation of chapter 721 of the Laws of 1871. The defense interposed was that the defendant became possessed of the game during the open season, or

it was received from the state of Minnesota or Illinois, where the killing was at the time legal. The questions were raised by demurrer to the answer. It was held that, the language of the statute being plain and unambiguous, there was no room for construction; that the court should apply the familiar rule that when the language is clear the meaning which it imports should be adopted; that the penalty was directed against the possession as well as the killing of game within the close season, irrespective of the time or place of killing the same. It was also decided that the statute under consideration did not violate the constitution of the state, or the federal constitution. This case has been cited as authority by the courts in many of the states in this country when similar statutes were under consideration, and it has not in express terms been overruled by any of the later decisions in the court from which it emanated. It therefore is, and should be, controlling in the disposition of like propositions there considered and decided, except so far as the principles applied have been disregarded or overruled by subsequent judicial authority of equal or greater weight. The learned court cites the opinion of Mr. Chief Justice Taney in the celebrated·License Cases, 5 How. 504, 12 L. Ed. 256, in support of the proposition that in the absence of the enactment of a law by congress the states may regulate commerce among themselves. The doctrine of this case is expressly overruled in the case of Leisy v. Harding, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, wherein it is declared that:

"The doctrine now firmly established is, as stated by Mr. Justice Field in Bowman v. Railway Co., 125 U. S. 507, 8 Sup. Ct. 689, 31 L. Ed. 700, 'that where the subject on which congress can act under its commercial power is local in its nature or sphere of operation, * * * which can be properly regulated only by special provisions adapted to their locality, the state can act until congress acts and supersedes its authority; but where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all of the states, such as transportation between the states, including the importation of goods from one state to another, congress can alone act upon it and provide the needed regulations. The absence of any law of congress upon the subject is equivalent to its declaration that commerce in that matter shall be free. Thus, the absence of regulation as to interstate commerce with reference to any particular subject is taken as a declaration that the importation of that article into the state shall be unrestricted.' "

Again in the same case the court says:

"These decisions rest upon the undoubted right of the states of the Union to control their purely internal affairs, in doing which they exercise powers not surrendered to the national government; but whenever the law of the state amounts essentially to a regulation of commerce with foreign nations or among the states, as it does when it inhibits, directly or indirectly, the receipt of any imported commodity, or its disposition, before it has ceased to become an article of trade between one state and another, or another country and this, it comes in conflict with a power which in this particular has been exclusively vested in the general government, and is therefore void."

The doctrine of the License Cases, supra, was again repudiated by the same court in the late case of Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49.

In People v. Hawkins, 157 N. Y. 1, 51 N. E. 257, 42 L. R. A. 490, Judge O'Brien made the announcement:

62 N.Y.S.—35

"No state can, in its sovereign capacity or in its fundamental law, enact anything in violation of the federal constitution, any more than can the legislature acting in a representative capacity. * * * A state law which interferes with the freedom of commerce is not saved by the fact that it applies to all states alike, including the state enacting it. If it is a regulation of commerce, the law relates to a subject within the exclusive jurisdiction of congress, upon which the state has no power to legislate. It matters not whether the regulation be under the guise of a law requiring a municipal license to sell certain goods, or a health law requiring inspection of the article, or a label law, as in this case, requiring the article to be branded or labeled. When they operate as burdens or restrictions upon the freedom of trade or commercial intercourse, they are invalid."

In view of these decisions of the highest courts of this state and of the nation, the Phelps Case, supra, cannot be regarded as authoritative upon the right of a state, in the absence of the assumed jurisdiction by the federal government, to regulate interstate and foreign commerce. On the contrary, it is unequivocally laid down that the absence of such regulation, with reference to any particular subject, must be taken as a declaration that the importation of that article into the state shall be and remain unrestricted by the state. After the importation is completed, and the property has been mingled with, and become a component part of, the general property of the state, the legislature may act, freed from any limitation imposed by the federal constitution or congressional enactment.

It was said in Schollenberger v. Pennsylvania, supra:

"The right of a state to enact laws in relation to the administration of its internal affairs is one thing, and the right of a state to prevent the introduction within its limits of an article of commerce is another and a totally different thing. Legislation which has its effect wholly within the state, and upon products manufactured and sold therein, might be held valid, as not in violation of any provision of the federal constitution, when at the same time legal action directed towards prohibiting the importation within the state of the same article manufactured outside of its limits might be regarded as illegal, because in violation of the rights of citizens of other states, arising under the commerce clause of that instrument."

The principle laid down by the case referred to clearly establishes the right of the defendant to import the fish in question into the state of New York, as a purchaser and importer; and, in the exercise of such right conferred by the federal government, it was not within the power of the legislature to make the possession of the property thus imported unlawful. Possession is a necessary incident to the right of importation, and to the right of property imported. Possession and the right of sale are the intended consequence of the right of importation. It would as effectually destroy the privilege of importation to make the intended consequence thereof unlawful, as to prohibit importation itself. Applying the rules laid down in the cases discussed to the admitted facts, that the fish in question were imported from the dominion of Canada, and a duty had been paid for such privilege under the Dingley act, some of which were in the hands of the importer for shipment, and the remainder in its possession for the purposes of sale, it is clear that the statute of this state making such possession unlawful is in con-

flict with the general power of congress to regulate commerce between foreign nations and the several states, and to the extent that it attempts to levy tribute upon the custodians of these fish, whether by means of taxation, or a penalty for having them in possession, it is null and void. If we concede the principle as stated by Judge Church in the Phelps Case, supra, that the state may regulate the commercial relations with other states and foreign countries until such time as congress shall exercise exclusive jurisdiction upon the subject, it would not, under the facts appearing in the case at bar, control in the disposition of this case. It is averred in the answer, and admitted by the demurrer, that the federal government had by treaties and tariff enactments accepted the trust ceded to it by the state, of controlling and regulating the subject of interstate and foreign commerce. It having been made to appear by the authorities cited that the defendant, upon paying the duties imposed by the government, had the right to import the fish in question, and, as an incident thereto, the right to the possession thereof, any legislation on the part of the state which made the possession of property lawfully imported unlawful is in direct conflict with the enactments of the federal government on that subject. The right of the defendant to sell the fish imported need not necessarily be here considered, except that it may be assumed that the object of such possession was for the purpose of selling the same to the customers of the defendant. "The object of importation," says Chief Justice Marshall in Brown v. Maryland, 12 Wheat. 442, 6 L. Ed. 678, "is sale. It constitutes the motive for paying the duties. And if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it. The practice of the most commercial nations conforms to this idea. Duties, according to that practice, are charged on those articles only which are intended for sale or consumption in the country. Thus, sea stores, goods imported and re-exported in the same vessel, goods landed and carried overland for the purpose of being re-exported for some other port, goods forced in by stress of weather, and landed, but not for sale, are exempt from the payment of duties. The whole course of legislation on the subject shows that, in the opinion of the legislature, the right to sell is connected with the payment of duties." Again, in the same case, this distinguished jurist asserts the doctrine with greater force and certainty:

"Commerce is intercourse. One of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficiency should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied by the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the whole thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell."

While it is not necessary to consider this feature of the case, the defendant being the importer, it seems to us important, in view of the conclusion which has been reached in respect to this case, that the inquiry should be made whether this statute is operative in respect to fish thus imported under any circumstances. The importer, as has been seen, not only has a right to bring his property into the country, but he has a right to sell that property, as an essential ingredient of the right to import. Having this right to sell, has the state, in the exercise of its police power, the authority to enact a valid statute which makes the purchaser of property, innocent in itself, a criminal, and subject to a penalty many times the value of the property? We think not. This goes beyond any legitimate attempt to regulate commerce, and, in effect, prohibits it. It says to the importer, "You may bring in your goods, and you may sell them;" but it says to the purchaser of this property that, if he does buy, he at that moment becomes a criminal, and subject to a fine of $25. This, in effect, prohibits the sale; and, as Mr. Chief Justice Marshall aptly says, "there is no difference in effect between the power to prohibit the sale of an article, and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold." "The court," says the great chief justice in the case of McCulloch v. Maryland, 4 Wheat. 436, 4 L. Ed. 579, "has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared."

This being the law of the land,—that the importer acquires a right not only to bring the articles into the country, but to mix them with the common mass of property,—the fish imported by this defendant became, by reason of such importation, absolute property in the hands of the importer, as well as all who might take title under them; and it is an abuse of the police power, which cannot be justified by any sound process of reasoning, to say that the legislature may make it a crime, and subject the owner of this lawfully acquired property to penalties for merely having the property in his possession. It is conceded, of course, that if these fish were diseased, or had remained exposed to the elements until they were unfit for food, and constituted a menace to the public health, the state would have the right to interpose its police powers and prevent the sale. "The assumption is," says Mr. Justice Catron in his opinion in the License Cases, 5 How. 600, 12 L. Ed. 299, "that the police power was not touched by the constitution, but left to the states as the constitution found it. This is admitted; and whenever a thing, from character or condition, is of a description to be regulated by that power in the state, then the regulation may be made by the state, and congress cannot interfere. But this must always depend on facts subject to legal ascertainment, so that the injured may have redress. And the

fact must find support in this: Whether the prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of commerce among the states. If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such when it is about to enter the state that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And, as an incident to this power, a state may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the state, and that which does belong to commerce is within the jurisdiction of the United States." Mr. Justice McLean, in the same case, lays down the rule governing the police power of the states, and says (page 592, 5 How., and page 296, 12 L. Ed.):

"When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied. Under the pretense of a police regulation, a state cannot counteract the commercial power of congress. * * * The state cannot, with a view to encourage its local manufactures, prohibit the use of foreign articles, or impose such a regulation as shall in effect be a prohibition. But it may tax such property as it taxes other and similar articles in the state,—either specifically, or in the form of a license to sell. A license may be required to sell foreign articles, when those of a domestic manufacture are sold without one. And, if the foreign article be injurious to the health or morals of the community, a state may, in the exercise of that great and conservative police power which lies at the foundation of its prosperity, prohibit the sale of it. No one doubts this in relation to infected goods or licentious publications. Such a regulation must be made in good faith, and have for its sole object the preservation of the health or morals of society. If a foreign spirit should be imported, containing deleterious ingredients, fatal to the health of those who use it, its sale may be prohibited. When, in the appropriate exercise of these federal and state powers, contingently and incidentally their lines of action run into each other, if the state power be necessary to the preservation of the morals, the health, or the safety of the community, it must be maintained. But this exigency is not to be founded on any notions of commercial policy, or sustained by a course of reasoning about that which may be supposed to affect in some degree the public welfare. The import must be of such a character as to produce by its admission or use a great physical or moral evil."

Mr. Justice Strong, delivering the opinion of the court in the case of Railroad Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527, says:

"Many acts of a state may, indeed, affect commerce, without amounting to a regulation of it, in the constitutional sense of the term. And it is sometimes difficult to define the distinction between that which merely affects or influences, and that which regulates or furnishes a rule for conduct. There is no such difficulty in the present case. While we unhesitatingly admit that a state may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the state; while, for the purpose of self-protection, it may establish a quarantine and reasonable inspection laws,—it may not interfere with transportation into or through the state, beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce."

"The extent and limits of what is known as the 'police power' have been a fruitful subject of discussion in the appellate courts of nearly

every state in the Union," says the court in the case of Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385. "It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. * * * Beyond this, however, the state may interfere wherever the public interests demand it; and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the public interests require, but what measures are necessary for the protection of such interests. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 257, 28 L. Ed. 923; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346. To justify the state in thus interposing its authority in behalf of the public. it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

It will be observed that all of the authorities insist that the police power of the states is to be used, not for the oppression of the individual, but for the protection of the public. As was said by the court of appeals in the case of Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302:

"That power must be exercised subject to the provisions of both the federal and state constitutions. Laws passed in the exercise of it must tend towards the preservation of the lives, health, morals, or welfare of the community; and the court must be enabled to see some clear and real connection between the assumed purpose of the law and the actual provisions thereof, and that the latter tend in some plain and appreciable manner towards the accomplishment of the objects for which the legislature may use its power. * * * It is to be observed that the statute does not relate to the health, morals, safety, or welfare of the public, but only to the private interests of a particular class of individuals. Nor can it be fairly said that the means provided for the protection of those interests are reasonably necessary to accomplish that purpose. But, on the contrary, they are plainly oppressive, and amount to an unauthorized confiscation of private property for the mere protection of private rights. It is in no manner attempted by this statute to protect any public interest or defend any public right. Nor is it calculated to accomplish that end, but, under the guise of a pretended police regulation, it arbitrarily invades personal rights and private property."

This case arose under a statute which provided for the summary seizure of any boat or vessel used by one person in interfering with oysters or other shellfish belonging to another, and for its forfeiture and sale, and the payment of the avails to the commissioners of fisheries, game, and forest; and while the facts present a stronger case, perhaps, than the one at bar, it does not detract from the force of the opinion as bearing upon the police powers of the state. If the police power of the state exists only for the purpose of protecting the interests of the public, it must be obvious that a statute which forbids the ownership of fresh-water fish during certain pe-

riods, regardless of the place or the circumstances under which they were captured and killed, and without any reference to the question of the rights of those who may have imported them, is not within the exception to the rule that the individual shall not be deprived of life, liberty, or property, without due process of law. In so far, then, as the forestry, game, and fisheries law imposes a penalty upon those having bass, pike, pickerel, and muskellunge in their possession during the closed season, such fish being subjects of interstate or foreign commerce, it is in conflict with both the federal and state constitutions, and is without force or effect. The object of the statute is to protect the game fishes in the waters of the state, and that object is not promoted by depriving citizens of their property in fish which have been caught and killed outside of the jurisdiction of the state, and which have become component parts of commerce; and the law cannot, therefore, be sustained as an exercise of the police power, except as it deals with those fish which may have been taken within the jurisdiction of the state. How far interstate comity might go in dealing with fish unlawfully taken in other states, it is not necessary or profitable to inquire at this time. It is enough to know that property which has become the subject of foreign commerce, or among the states, cannot be subjected to regulations within the state which amount to a practical prohibition of commerce, and it is immaterial whether these goods have paid a duty or not. "But," says Mr. Justice Catron in the License Cases, supra, "while foreign liquors, imported according to the regulations of congress, remain in the cask, bottle, etc., in the original form, then the importer may sell them in that form at the port of entry, or in any other part of the United States; nor can any state law hinder the importer from doing so. Nor does it make any difference whether the imported article paid a tax on its introduction, or was admitted as a free article. Until it passes from the hands of the importer, it is an import, and belongs to regulated foreign commerce, and is protected."

Passing to the consideration of the statute under which the case at bar is brought, it is apparent that it differs in some important respects from the law of 1871, which was under consideration in the case of Phelps v. Racey, 60 N. Y. 10, and it may not be out of place to point out the distinguishing features. The law of 1871, without qualification, provided that "no person shall kill or expose for sale, or have in his or her possession, after the same has been killed, any quail, between the 1st day of January and the 20th day of October, under a penalty of $25.00 for each bird"; but by the provisions of section 33 of the same act it was provided that no penalty should attach from the 1st day of January to the 1st day of March, a period of two months, if the defendant could prove either that the birds were killed during the open season, or in a state where it was lawful to kill such birds. This statute recognized the right of property in the birds; giving the owner a reasonable time in which to dispose of such as might lawfully come into his possession, and fixing a time beyond which he should not have them. While this would not meet the constitutional objection in reference to inter-

state commerce, as understood to-day, it was in harmony with the exposition of the constitution then in vogue; and it might fairly be held that the state had a right, in the exercise of its power to protect game, to fix a time beyond which the possession of prohibited game would in itself be unlawful. There is certainly a very different state of facts involved in that case than is present in the one at bar, and the case of Phelps v. Racey cannot be controlling in this instance.

There is, however, another feature of the present statute which is not found in the law of 1871. The statute of 1895, amending the game laws, in so far as it affects this case, provides that:

"Black bass or Oswego bass shall not be fished for, caught, killed or possessed except from the fifteenth day of June to the thirty-first day of December, both inclusive, and shall not be fished for, caught, or killed in Lake George or Schroon Lake, except from the first day of August to the fifteenth day of December, both inclusive, and shall not be fished for, caught or killed in the Schoharies river or in Fox's creek, within three years from the thirty-first day of May, 1896, except in the month of August. Pickerel, pike, or wall-eyed pike, shall not be fished for, caught or killed or possessed except from the first day of May to the thirty-first day of January, both inclusive, except as provided in section 141. Provided, however, that the commissioners of fisheries, game and forest, shall have power to permit the taking or destruction of pickerel at any time in the waters inhabited by trout. The provisions of this section shall not apply to the St. Lawrence between Tibbet's Point lighthouse and the city of Ogdensburg. Whoever **shall** violate or attempt to violate the provisions of this section shall be deemed guilty of a misdemeanor and in addition thereto shall be liable to a penalty of $25.00 for each fish so caught, killed or possessed."

Pickerel may be lawfully taken, and therefore possessed, if the commissioners of fisheries give their permission, and pickerel, pike, or wall-eyed pike, as well as black or Oswego bass, may be fished for, caught, killed, and possessed from the St. Lawrence river from Tibbet's Point lighthouse to Ogdensburg, a distance of 60 miles or more; for the law specially provides that the provisions of this section shall not apply to the St. Lawrence between these two points. "This section" is section 110 of the fish and game law, and is the only section providing for the penalties for having those fish in possession; and, as it is specially provided that it shall not apply to the St. Lawrence river between the points named, it follows that the penalty does not attach for having in possession fish caught in this portion of the river. Section 1 of article 1 of the constitution of this state provides that "no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizens thereof, unless by the law of the land, or the judgment of his peers"; and this statute, which makes it a penal offense to have certain fish in possession, excepting those taken from within certain limits of the St. Lawrence river, may have to be considered in a future case, when the question is raised. It is enough for our present purpose to point out the exception to the operation of the law, and to suggest that, if the penalty is to be collected, it is necessary to show that the fish were not taken under the exceptional clause, as well as that they were not the subject of regulated commerce.

That the state may, in the exercise of its undoubted power to regulate the taking of fish and game, prescribe the times and the conditions of catching and killing wild animals or fish, and may even limit the individual right of property in such fish or game, will not be disputed. The doctrine has been settled by the court in the case of Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793, affirming the judgment of the supreme court of that state. This does not, however. justify the state in enacting laws which in effect prohibit interstate and foreign commerce; and the demurrer in the case at bar should be overruled, with costs to the defendants.